# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES L. BRYANT and JACK DELIDDO,<br><br>        Plaintiffs,<br>   v.<br><br>MICHAEL MATVIESHEN and DOES 1 through 25, inclusive,<br><br>        Defendants. | 1:12-CV-00572  AWI SKO<br><br>ORDER RE: PLAINTIFFS' MOTION TO MODIFY TEMPORARY RESTRAINING ORDER AND FOR SANCTIONS AGAINST DEFENDANT<br><br>(Doc. 20) |

This case stems from a written agreement (the "MJC Agreement") entered into by Plaintiffs Charles L. Bryant and Jack Deliddo ("Plaintiffs"), residents of Stanislaus County, California; and Defendant Michael Matvieshen, a resident of British Columbia, Canada ("Defendant").[1]  Plaintiffs allege causes of action for breach of contract, fraud, negligent misrepresentation, suppression of fact, promise made without intent to perform, conversion, constructive trust, declaratory relief, alter ego relief, and injunctive relief.  Plaintiffs made a

---

[1] Personal jurisdiction over Defendant Matvieshen appears to be established by the venue clause in the MJC Agreement, which provides: "This agreement shall be governed by the laws of the State of California without regard to conflict of laws provisions thereof.  The Parties hereby irrevocably agree to the exclusive jurisdiction of the state and federal courts sitting in the State of California."  Doc. 4, Ex. A.

motion for temporary restraining order ("Original TRO"), which was granted on April 27, 2012. Doc. 7.  At a preliminary injunction hearing on May 10, 2012, the TRO was modified ("Second TRO") to remove some restrictions on Defendant's actions.  Currently pending before the Court is Plaintiffs' motion to modify the terms of the Second TRO and for sanctions against Defendant. For the reasons that follow, the motion to modify is granted in part and a briefing schedule is set for the sanctions motion.

**I. History**

In 2009, Plaintiff Deliddo formed Rooftop Energy, LLC ("Rooftop"), a company specializing in large scale commercial solar projects. Doc. 4, Complaint, ¶ 8.  Shortly thereafter, Plaintiff Deliddo sold a 51% interest in Rooftop to Plaintiff Bryant. Doc. 4, Complaint, ¶ 9. Plaintiffs entered into discussions with Defendant regarding assistance with obtaining solar panels and financing for various large-scale projects, including projects with General Motors ("GM").  Defendant already owned a number of corporations involved with solar/electric projects, among them ICP Solar Technologies, Inc. ("ICP") and Epod Solar, Inc. ("Epod").  In 2010, Defendant offered to purchase Rooftop in exchange for cash and stock in ICP. Doc. 4, Complaint, ¶ 13.  The parties contemplated that ICP would fulfill the GM projects initiated by Rooftop. Doc. 4, Complaint, ¶ 13.  Plaintiffs agreed to a sale of 100% of their membership interests in Rooftop to ICP for $3 Million in vested cash payouts, a 20% stock interest in ICP, and employment/consulting agreements ("Rooftop Agreement"). Doc. 6, Part 2, Ex. A; Doc. 4, Complaint, ¶ 13; Doc. 6, Part 7, Deliddo Declaration, ¶ 6; Doc. 6, Part 1, Bryant Declaration, ¶ 9. Plaintiffs, however, never received the cash payment promised, and ICP turned out to have cash flow problems, making it a poor candidate for the potential GM projects. Doc. 4, Complaint, ¶ 14.

Defendant represented to Plaintiffs that Sunlogics, Inc. ("Sunlogics INC), a Canadian corporation controlled by Defendant, was in a better position than ICP to pursue the business strategies and GM projects initiated by Rooftop. Doc. 4, Complaint, ¶ 16.  Plaintiffs agreed to allow Defendant to transfer Rooftop from ICP to Sunlogics INC, and for their consulting

contracts to be assigned to Sunlogics INC, in exchange for a 30% interest for each Plaintiff in Sunlogics INC. Doc. 4, Complaint, ¶ 16; Doc. 6, Part 7, Deliddo Declaration, ¶¶ 7-8; Doc. 6, Part 1, Bryant Declaration, ¶¶ 9-11.  Throughout this period, Defendant continued to confirm to Plaintiffs that the three of them were in business together, and that they would own all of the corporations in which they participated together 40-30-30, but that Defendant would be entitled to vote 50% of the stock and Plaintiffs would each vote 25%. Doc. 4, Complaint, ¶ 19.

At an unspecified date, Plaintiffs and Defendant appear to have purchased Salamon Group, Inc. ("Salamon") from Space Globe Technologies, Inc. ("Space Globe"), using funds from Rooftop. Doc. 6, Part 1, Bryant Declaration, ¶ 12.  After developing and modifying a business plan, Plaintiffs and Defendant executed the MJC Agreement on December 21, 2010, under which the parties agreed to the allocation of their respective ownership interests in various companies in which they agreed to participate and operate together. Doc. 4, Complaint, ¶ 32; Doc. 6, Part 7, Deliddo Declaration, ¶¶ 11, 14-15; Doc. 6, Part 1, Bryant Declaration, ¶ 11. Among other things, the MJC Agreement provides that Defendant was "the directing shareholder" of Sunlogics, Plc ("Sunlogics PLC") and Salamon. Doc. 4, Ex. A, ¶ 1. Sunlogics PLC is a United Kingdom company whose shares are traded on the Frankfurt stock exchange and is the parent company of Sunlogics INC.  The MJC Agreement further provides that Defendant was "holding shares in trust" for Plaintiffs, and that Defendant "agrees to transfer 60% of such ownership interests held by [Defendant], 30% to [Deliddo] and 30% to [Bryant]" in Sunlogics PLC and Salamon. Doc. 4, Ex. A, ¶ 1.  The MJC Agreement also provides that Defendant will have a 40% interest and Plaintiffs will each have a 30% interest "in any and all companies in which they participate together presently or in the future. . .." Doc. 4, Ex. A, ¶ 2.  The MJC Agreement stated that "Although the stock ownership will be 30%-30%-40% as between [Deliddo, Bryant, and Defendant], as to each of the entities, the parties agree that the voting rights for any entity in which (sic) as between the parties will be as follows: [Defendant] 50%, [Bryant] 25%, [Deliddo] 25%. The parties agree to vote their stock in accordance with this agreement." Doc. 4, Ex. A, ¶ 3.  The MJC Agreement expressly contemplated that Plaintiffs and Defendant would not be the sole owners of these companies.  The ownership and voting ratios

applied to the portion of these companies owned by Plaintiffs and Defendants.

The Sunlogics PLC and Salamon shares were supposed to be transferred to Plaintiffs at the time that a merger was closed between Sunlogics PLC (and its subsidiaries) and Phoenix Solar Holdings Corp. ("Phoenix"). Doc. 4, Complaint, ¶ 28. However, Defendant transferred only a portion of the promised shares. Doc. 4, Complaint, ¶ 38; Doc. 6, Part 7, Deliddo Declaration, ¶¶ 14-17; Doc. 6, Part 1, Bryant Declaration, ¶¶ 24-31. Defendant knew there was considerable pressure to close the merger quickly, and he offered numerous explanations why the shares should remain held beneficially subject to later adjustment between the individuals to comply with the MJC Agreement. Doc. 4, Complaint, ¶¶ 29, 36. During the time the merger was pending, Plaintiffs contend Defendant convinced them to agree to the formation of two offshore companies, Millennium Trends International, Inc., a Bahamas company ("Millennium"), and Maverick Ventures SA, a Swiss company ("Maverick"), that would also be subject to the MJC Agreement. Doc. 4, Complaint, ¶ 30; Doc. 6, Part 7, Deliddo Declaration, ¶ 16; Doc. 6, Part 1, Bryant Declaration, ¶¶ 18, 25. On May 13, 2011, Defendant caused Salamon to complete a reverse merger with Sunlogics Power Fund Management, Inc. ("Powerfund"), making Salamon the 100% owner of Powerfund. Doc. 4, Complaint, ¶ 31. Before the transaction, Defendant was the sole owner of Powerfund. In July 2011, GM invested $7,500,000 in Sunlogics PLC in exchange for 14% of the company, diluting Plaintiffs' and Defendant's stakes. Doc. 6, Part 1, Bryant Declaration, ¶ 27. In the course of the merger between Sunlogics PLC and Phoenix, Defendant also caused 9,000,000 shares to be issued, to be used to buy certain of Epod and ICP's assets; Defendant represented to Plaintiffs that any excess shares from the 9,000,000 would be reallocated among Plaintiffs and Defendant using the 30-30-40 formula. Doc. 4, Complaint, ¶ 35. In November 2011, Defendant resigned from his positions as CEO, Director, and Chairman of the Board of Sunlogics PLC and Sunlogics INC. Doc. 22, Part 2, Matvieshen Declaration, ¶10. Plaintiffs allege Defendant was removed from these positions for misconduct. Doc. 4, Complaint, ¶ 42.

Through January 2012, Defendant continued to make promises regarding the adjustments and to reassure Plaintiffs of his intent to complete the promised transfers of shares. Doc. 6, Part

4

1, Bryant Declaration, ¶¶ 13, 33; Doc. 6, Part 3, Ex. M.  However, in March 2012, Defendant refused to transfer the shares and began making threats to transfer the shares to other parties. Doc. 6, Part 1, Bryant Declaration, ¶¶ 33-40.  The various share transfers appear to have been undertaken through a company called Computershare. Doc. 4, Complaint, ¶ 37.

On April 10, 2012, Plaintiffs filed a verified complaint and application for TRO and preliminary injunction in the Superior Court for the State of California, County of Fresno.  A hearing on the TRO was set for April 12, 2012.  On April 12, 2012, Defendant filed a Notice of Removal in this court.  On April 25, 2012, Plaintiffs filed another application for TRO.  The Original TRO was granted on April 27, 2012, with a $2,000 bond, ordering in relevant part:

> Defendant Michael Matvieshen, his agents, servants, employees, assignees, attorneys and all those acting in concert or participation with him are RESTRAINED AND ENJOINED from taking any actions to sell, transfer, hypothecate or encumber or take any action that would devalue in any manner the shares of common stock of Sunlogics Plc ("Sunlogics") a United Kingdom corporation, Salamon Group, Inc. ("Salamon") a Nevada corporation, Millennium Trends, Inc. ("Millennium"), a Bahamas corporation, or Maverick Group, Inc. ("Maverick') a Swiss corporation, at issue in this case.  Without limitation, this specifically extends to entering into any definitive agreement for the transfer of stock from Millennium or Maverick.

Doc. 7, Original TRO, 7:26-8:7.  The goal of the TRO was to protect Plaintiffs' ownership interests under the MJC Agreement.  A preliminary injunction hearing was held on May 10, 2012.  After considering the arguments of the parties, the court indicated that a preliminary injunction was appropriate.  Up through that point, the parties had been arguing in terms of percentages; they had not indicated the exact number of shares of Sunlogics PLC or Salamon that constituted the 30-30-40 covered by the MJC Agreement.  The parties were ordered to meet and confer to come up with language for the preliminary injunction which would be more specific.

In addition, the Original TRO was to be modified in three ways.  First, the language "or take any action that would devalue in any manner" was eliminated.  Defendant remained the CEO/head of Salamon, Millennium, and Maverick.  He had to make business decisions which might affect the value of these companies.  As the Original TRO was limited to preserving Plaintiffs' ownership interests and not intended to interfere withe Defendant's flexibility in running the companies, the language was deleted.  Second, the Original TRO prohibited Defendant from selling any of the specified stock, even his own 40%.  The restrictions on

5

Defendant's 40% interest were lifted. Third, the court clarified that the restrictions do not apply to Sunlogics PLC or Salamon stock owned by Epod or ICP (the up to 9,000,000 shares given to those companies in exchange for assets transferred to Sunlogics PLC). The terms of the Original TRO, with these three modifications, constitute the Second TRO, effective May 10, 2012.

Plaintiffs now move to have the Second TRO modified. Doc. 20. Plaintiffs point out that Defendant has called a general shareholders meeting of Salamon to issue 250 million shares of additional stock (existing shares total 40 million) and to create a new preferred class of stock with 200 times the voting power of common stock. Doc. 20, Part 4, Bryant Declaration, ¶¶ 9-10. At the shareholders meeting, Salamon is also considering a corporate name change to "Sunlogics Powerfund Inc." Doc, 20, Part 3, Brief, 3:13. Plaintiffs also allege that Defendant is causing a number of Sunlogics PLC stock to be shifted between various entities:

> on April 30, 2012, MATVIESHEN initiated share transfers of Sunlogics Plc stock, including the transfer of (a) 3,728,342 shares of Sunlogics Plc stock held by MATVIESHEN personally to Salamon Group, Inc.; (b) 7,500,000 shares of Sunlogics Plc stock purportedly held by Epod Ventures, Inc. to Salamon Group, Inc.; (c) 2,000,000 shares of Sunlogics Plc stock purportedly held by 531682 BC Ltd1 to Shari Matvieshen (Defendant MATVIESHEN's wife); (d) 225,000 shares of Sunlogics Plc stock purportedly held by ICP Solar Technologies, Inc. to Ryan Husch2, 250,000 shares to Denis Husch, and 100,000 shares to Nicholas Husch; and (e) 925,000 shares of Sunlogics Plc stock purportedly held by ICP Solar Technologies, Inc. to Salamon Group, Inc....The transfer from MATVIESHEN to Salamon is a clear violation of the TRO and the other transfers demonstrate a clear propensity of MATVIESHEN to violate court orders.

Doc. 20, Part 3, Brief, 2:15-3:3. Plaintiffs also seek to have Defendant sanctioned for violations of the Original and Second TROs. The matter was heard on an expedited basis as the shareholders meeting is scheduled to take place May 30, 2012.

**II. Legal Standards**

The substantive standard for granting a temporary restraining order is the same as the standard for entering a preliminary injunction. Bronco Wine Co. v. U.S. Dep't of Treasury, 997 F.Supp. 1309, 1313 (E.D. Cal. 1996); Lockheed Missile & Space Co. v. Hughes Aircraft Co., 887 F.Supp. 1320, 1323 (N.D. Cal. 1995). A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4)

6

that an injunction is in the public interest.  Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 374 (2008); Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust, 636 F.3d 1150, 1160 (9th Cir. 2011).  "Injunctive relief...must be tailored to remedy the specific harm alleged."  Park Vill., 636 F.3d at 1160.

### III. Discussion

The Original and Second TROs were granted to protect a specific interest: Plaintiffs' right to the 60% ownership of the shares and the 50% voting rights of those shares under the MJC Agreement.  Any modification must serve to protect that narrow goal.

**A. Creation of New Salamon Stock**

On May 18, 2012, Salamon called for a general shareholders meeting on May 30, 2012. On the Proxy Statement were several proposals, including three that involved issuing new stock in the company.  One proposal would create 250 million new common shares; only 40 million common shares exist.  The second proposal would create a new class of 3 million preferred shares, each of which would have 200 times the voting power of a common share.  The third proposal would give Defendant new shares of stock to prepay him for a convertible debenture created by his transfer of Sunlogics PLC stock to Salamon (referenced above).  Plaintiffs argue that creation of these shares would greatly dilute Plaintiff's 60% ownership and 50% voting MJC Agreement interest in Salamon.  Defendant argues that the plan to issue the new stock is a valid business decision to recapitalize Salamon after Sunlogics PLC (from which Defendant was ousted) recently reneged on an agreement to loan Salamon $2,500,000. Doc. 22, Part 2, Matvieshen Declaration, ¶¶ 10-11.

Bryant states "I am not interested in trying to control the corporation outside of the rights attached to my shares; however, I believe it is improper to radically change the rights associated with my shares while I am prevented from voting stock[] admittedly 'in trust' for me in relation to those proposals." Doc. 20, Part 4, Bryant Declaration, ¶ 7.  This statement goes to the heart of the matter.  The only interest the Original and Second TROs are meant to protect are the

ownership and voting rights of Plaintiffs in Sunlogics PLC and Salamon.  The TROs are not meant to guarantee good corporate governance; the court will not be dragged into ongoing disputes over whether Defendant's actions constitute reasonable business practices.  Plaintiffs request that Salamon be prohibited from issues 250 million shares but be allowed to "submit a proxy statement for shares of additional common stock not to exceed the greater of the number of shares of Salamon Group, Inc. common stock necessary to approve currently outstanding Letters of Intent with third parties." Doc. 20, Part 6, Proposed Order, ¶ 2.  Again, Plaintiffs do not provide firm numbers concerning the number of shares in question.  Defendant states that Plaintiffs' 60% ownership under the MJC Agreement only allows them to "voting under 10% of [Salamon's] outstanding shares," and are unlikely to be decisive in any vote. Doc. 22, Opposition, 3:16-18. Both parties agree that new shares should be issued but disagree on how many shares that should be.  The court has no good way of determining which side is right; this is an internal business decision.

The scope of the TROs is to effectuate the 30-30-40 ratio between Plaintiffs and Defendants regarding the shares covered by the MJC Agreement.  As previously stated, the MJC Agreement explicitly recognized that Plaintiffs and Defendants would not be the sole owners of Salamon; shares would also be owned by third parties.  The TRO to protect the MJC Agreement cannot be used to abridge the rights of these third party shareholders.  The court cannot set the agenda for the May 30, 2012 shareholder meeting.  The court can only protect Plaintiffs' voting rights and ensure that they can vote their 50% interest under the MJC Agreement at the shareholder meeting.  To the extent that the existing TRO language does not protect that voting interest, the motion for modification is granted.

 **B. Changing Salamon's Name**

Plaintiffs state "The Proxy Statement proposes to change the name of the corporation for Salamon Group, Inc. to Sunlogics Power Fund Inc. This would cause substantial confusion to the shareholders of Salamon Group, Inc., who plaintiffs believe are being led to believe there is a connection that does not exist between Salamon Group, Inc. and Sunlogics Inc. or Sunlogics

Plc." Doc. 20, Part 3, Brief, 8:1-5.  Plaintiffs seek to have the proposal withdrawn from the shareholders meeting.  Defendant does not address this issue in their opposition, but given the tight time constraints of the briefing schedule, it is an understandable oversight.  At the May 29, 2012 hearing, Defendant objected to Plaintiffs' request.  The court does not see how the change of name affects Plaintiffs' ownership interest.  Though there may be some trademark concerns, intellectual property is outside the purview of the injunctive relief.

### IV. Order

1. Plaintiffs' motion to modify the Second TRO is GRANTED in part.  This modified temporary restraining order will remain in effect until 3:00 PM, June 12, 2012, or until superceded by a preliminary injunction order.

2. Defendant Michael Matvieshen, his agents, servants, employees, assignees, attorneys and all those acting in concert or participation with him are RESTRAINED AND ENJOINED from taking any actions to sell, transfer, hypothecate or encumber Plaintiffs' contested 60% ownership interest under the MJC Agreement of stock of Sunlogics Plc ("Sunlogics PLC") a United Kingdom corporation, Salamon Group, Inc. ("Salamon") a Nevada corporation, Millennium Trends, Inc. ("Millennium"), a Bahamas corporation, or Maverick Group, Inc. ("Maverick') a Swiss corporation.  The 60% interest under the MJC Agreement does not include stock owned by ICP Solar Technologies, Inc. ("ICP") and Epod Solar, Inc. ("Epod"). Additionally, Defendant may not vote Plaintiffs' contested 50% voting interest under the MJC Agreement of Sunlogics PLC, Salamon, Millenium, and Maverick stock.

3. A hearing on a motion for civil contempt is set for 1:30 PM, July 9, 2012 in courtroom two.  Plaintiffs' initial briefing is due 4:00 PM, June 15, 2012.  Defendant's opposition is due 4:00 PM, June 29, 2012.  Plaintiffs' reply is due 10:00 AM, July 6, 2012.

IT IS SO ORDERED.

Dated:  May 30, 2012

CHIEF UNITED STATES DISTRICT JUDGE