IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES L. BRYANT and JACK DELIDDO,<br><br>            Plaintiffs,<br>     v.<br>MICHAEL MATVIESHEN and DOES 1 through 25, inclusive,<br><br>            Defendants. | 1:12-CV-00572  AWI SKO<br><br>ORDER RE: MOTION FOR TEMPORARY RESTRAINING ORDER<br><br>(Doc. 63) |

## I. History

The factual background of this case is complex. There are four active complaints: the original, two counterclaims, and a counterclaim to a counterclaim These complaints appear to contain some inconsistent facts.

In 2009, Jack Deliddo ("Deliddo") formed Rooftop Energy, LLC ("Rooftop"), a company specializing in large scale commercial solar projects. Doc. 4, Complaint, ¶ 8. Shortly thereafter, Deliddo sold a 51% interest in Rooftop to Charles Bryant ("Bryant"). Doc. 4, Complaint, ¶ 9. Plaintiffs entered into discussions with Michael Matvieshen ("Matvieshen") regarding assistance with obtaining solar panels and financing for various large-scale projects, including projects with General Motors ("GM"). Matvieshen already owned a number of corporations involved with

solar/electric projects, among them ICP Solar Technologies, Inc. ("ICP"), a subsidiary of Epod Solar, Inc. ("Epod").  In 2010, Matvieshen offered to purchase Rooftop from Bryant and Deliddo in exchange for cash and stock in ICP. Doc. 4, Complaint, ¶ 13.  The parties contemplated that ICP would fulfill the GM projects initiated by Rooftop. Doc. 4, Complaint, ¶ 13.  In August 2010, Bryant and Deliddo agreed to a sale of 100% of their membership interests in Rooftop to ICP for $3 Million in vested cash payouts, a 20% stock interest in ICP, and employment/consulting agreements ("Rooftop Agreement"). Doc. 6, Part 2, Ex. A; Doc. 4, Complaint, ¶ 13; Doc. 6, Part 7, Deliddo Declaration, ¶ 6; Doc. 6, Part 1, Bryant Declaration, ¶ 9.  Bryant and Deliddo, however, never received the cash payment promised, and ICP turned out to have cash flow problems, making it a poor candidate for the potential GM projects. Doc. 4, Complaint, ¶ 14.  Bryant and Deliddo became 10% shareholders in ICP. Doc. 6, Part 1, Bryant Delcaration, ¶ 28.

      Matvieshen represented to Bryant and Deliddo that Sunlogics, Inc. ("Sunlogics INC), a Canadian corporation which was controlled by Matvieshen, was in a better position than ICP to pursue the business strategies and GM projects initiated by Rooftop. Doc. 4, Complaint, ¶ 16.  At that time, Matvieshen was 100% owner of Sunlogics INC. Doc. 62, Counterclaim, ¶9.  Bryant and Deliddo agreed to allow Matvieshen to transfer Rooftop from ICP to Sunlogics INC, and for their consulting contracts to be assigned to Sunlogics INC, in exchange for a 30% interest each in Sunlogics INC. Doc. 4, Complaint, ¶ 16; Doc. 6, Part 7, Deliddo Declaration, ¶¶ 7-8; Doc. 6, Part 1, Bryant Declaration, ¶¶ 9-11.  On September 14, 2010, Deliddo was made a member of the Board of Directors of Sunlogics INC. Doc. 4, Complaint, ¶ 20.  The parties restructured the companies in January 2011, agreeing that Sunlogics, Plc ("Sunlogics PLC") would become the parent of Sunlogics INC which was the parent of Rooftop. Doc. 62, Counterclaim, ¶¶ 10 and 12.  Sunlogics PLC is a British company, created in July 2010 whose shares are traded on the Frankfurt stock exchange. Doc. 4, Complaint, ¶ 17.  Bryant, Deliddo, and Matveshen became members of the Board of Directors of Sunlogics PLC. Doc. 62, Counterclaim, ¶ 12.  In 2011, Rooftop's name was officially changed to Sunlogics Energy Solutions, LLC. Doc. 62, Counterclaim, ¶ 9.

In November 2010, Matvieshen discussed with Bryant and Deliddo the possibility of Sunlogics INC acquiring Salamon Group, Inc. ("Salamon"), a publically traded company incorporated in Nevada. Doc. 62, Counterclaim, ¶ 14. Salamon was a solar power syndication (which appears to be a form of financing) company. Doc. 63, Part 1, Bryant Declaration, ¶ 32. It is unclear whether Bryant and Deliddo gave Matvieshen permission to go forward with the transaction or if they had any ownership interest of Sunlogics INC at that time. Doc. 63, 6:16-18. In November 2010, there were 26 million shares of Salamon. Matvieshen arranged for Sunlogics INC to purchase 16 million shares from Space Globe Technologies, Inc. ("Spaceglobe"). Doc. 62, Counterclaim, ¶15. Bryant asserts that Matvieshen was purchasing Salamon for the Matvieshen, Bryant, and Deliddo group. Sunlogics INC used funds from Rooftop to pay Spaceglobe. Doc. 6, Part 1, Bryant Declaration, ¶ 12. Though 16 million shares were purchased, only 9 million shares were officially transferred. Doc. 62, Counterclaim, ¶ 17. These shares were transferred to Matvieshen personally instead of Sunlogics INC or Bryant and Deliddo; the 9 million shares are in Matvieshen's name. Doc. 62, Counterclaim, ¶¶ 18-20. Apparently, control over the remainder of Salamon shares (approximately 7 or 8 million) is disputed, with those shares still in the name of Spaceglobe. Doc. 4, Complaint, ¶24. The nature of that dispute is unknown and it is not exactly clear how that dispute affects this case. Matvieshen took control of Salamon by December 2010 and completed a reverse merger with Sunlogics Power Fund Management, Inc. ("Powerfund"). Doc. 62, Counterclaim, ¶ 21. Matvieshen created Powerfund in July 2010. Doc. 4, Complaint, ¶ 17. Powerfund is a Canadian corporation. Doc. 62, Counterclaim, ¶ 3. As payment for Powerfund, Matvieshen had an additional 20 million shares of Salamon and 20 million shares of Salamon warrants created and given to himself. Doc. 62, Counterclaim, ¶ 21. Thus, it is estimated that Matvieshen had 29 million shares of Salamon in his name, out of a total of 46 million shares in early 2011. On May 2, 2011, Sunlogics INC and Powerfund signed a right of first refusal agreement. Doc. 62, Counterclaim, ¶24. Salamon currently claims to have the rights of first offer to purchase GM projects from Sunlogics INC. Doc. 4, Complaint, ¶ 25; Doc. 62, Counterclaim, ¶26.

      To effectuate the division of ownership in these companies, Matvieshen, Bryant, and

Deliddo signed an agreement on December 10, 2010 ("MJC Agreement"). Doc. 4, pages 51-53 of 54.  Among other things, the MJC Agreement provides that Matvieshen was "the directing shareholder" of Sunlogics PLC and Salamon. Doc. 4, Ex. A, ¶ 1.  The MJC Agreement further provides that Matvieshen was "holding shares in trust" for Bryant and Deliddo, and that Matvieshen "agrees to transfer 60% of such ownership interests held by [Matvieshen], 30% to [Deliddo] and 30% to [Bryant]" in Sunlogics PLC and Salamon. Doc. 4, Ex. A, ¶ 1.  The MJC Agreement also provides that Matvieshen will have a 40% interest and Bryant and Deliddo will each have a 30% interest "in any and all companies in which they participate together presently or in the future. . .." Doc. 4, Ex. A, ¶ 2.  The MJC Agreement stated that "Although the stock ownership will be 30%-30%-40% as between [Deliddo, Bryant, and Matvieshen], as to each of the entities, the parties agree that the voting rights for any entity in which (sic) as between the parties will be as follows: [Matvieshen] 50%, [Bryant] 25%, [Deliddo] 25%. The parties agree to vote their stock in accordance with this agreement." Doc. 4, Ex. A, ¶ 3.  The MJC Agreement expressly contemplated that Matvieshen, Bryant, and Deliddo would not be the sole owners of these companies.  The ownership and voting ratios applied to the portion of these companies they owned.  Of note, the MJC Agreement referred to "Salamon Group, Inc. or Sunlogics Power Fund Management Inc." suggesting that the merger between Salamon and Powerfund had already taken place by the time the MJC Agreement was signed.

    Meanwhile separate from the dealings described above, in October 2010, Sunlogics INC (then controlled by Matvieshen) entered into a merger agreement with Phoenix Solar Holdings, Inc.[1] ("Phoenix"), collection of affiliated companies; the agreement was completed on June 10, 2011. Doc. 62, Counterclaim, ¶ 11.  With all of the mergers, the companies headed by Sunlogics PLC was becoming a vertically integrated solar energy development company.  It is assumed, Matvieshen controlled Sunlogics INC, Sunlogics PLC, Powerfund, and Salamon (after the purchase from Spaceglobe) in some manner.  It is not clear what titles Matvieshen held at these companies in the time frame at issue.  The merger between Sunlogics INC and PLC with Phoenix

---

[1] Phoenix Solar Holdings is called both an Inc. and a Corp. See Doc. 62, Counterclaim, ¶ 11; Doc. 4, Complaint, ¶ 28.  The court assumes that these terms are referring to the same entity.

was accomplished through some form of share exchange. Doc. 62, Counterclaim, ¶ 11.  While Sunlogics PLC and Salamon are publically traded companies, it is unclear whether shares for Sunlogics INC or Powerfund exist.  Notwithstanding the MJC Agreement (which explicitly covered ownership of Sunlogics PLC and Salamon), all relevant shares were held by Matvieshen through June 2011 to complete the merger with Phoenix. Doc. 4, Complaint, ¶ 29.  At the time of the merger, there were a total of 32 million shares in Sunlogics PLC of which 16.5 million were subject to the MJC Agreement. Doc. 4, Complaint, ¶ 34.  Additionally, 9 million shares were set aside to be used to buy certain of Epod and ICP's assets; Matvieshen represented to Bryant and Deliddo that any excess shares from the 9 million would be reallocated among themselves using the 30-30-40 formula. Doc. 4, Complaint, ¶ 35.

During the time this merger was pending, Bryant, Deliddo, and Matvieshen agreed to the formation of two offshore companies, Millennium Trends International, Inc., a Bahamas company ("Millennium"), and Maverick Ventures SA, a Swiss company ("Maverick"), that would also be subject to the MJC Agreement. Doc. 4, Complaint, ¶ 30; Doc. 6, Part 7, Deliddo Declaration, ¶ 16; Doc. 6, Part 1, Bryant Declaration, ¶¶ 18, 25.  Some of Bryant's and Deliddo's shares in Sunlogics PLC under the MJC Agreement were held by Millenium and/or Maverick. Doc. 4, Complaint, ¶ 36.  In July 2011, GM invested $7,500,000 in Sunlogics PLC in exchange for 14% of the company. Doc. 6, Part 1, Bryant Declaration, ¶ 27.  There was a non-dilution agreement so additional shares were issued to Bryant, Deliddo, and Matvishen. Doc. 4, Complaint, 14:23-25.  The total number of shares in Sunlogics PLC becomes unclear at this point.  Bryant and Deliddo have only received 2,446,415 shares of Sunlogics PLC though each is entitled to 7,986,978 shares. Doc. 4, Complaint, ¶ 38.

On June 10, 2011, Matveshen and Sunlogics INC signed an employment agreement ("Employment Agreement"). Doc. 63, Part 9, Ex A.  In September 2011, Matvieshen approached the Board of Directors of Sunlogics PLC with a proposal to purchase Arise Solar Technologies, Inc. ("Arise"); the Sunlogics PLC Board denied the request. Doc. 62, Counterclaim, ¶ 28.  Matvieshen had Salamon purchase Arise, using more than $200,000 from Sunlogics INC's bank accounts. Doc. 62, Counterclaim, ¶ 28.  On November 17, 2011, the Board of Directors of

Sunlogics PLC called a special meeting an confronted Matvieshen about his purchase of Arise. Doc. 62, Counterclaim, ¶ 29.  Matvieshen was also confronted about his attempts to buy additional companies, Revergy and Energy Conversion Devices, after the Board of Directors told him to concentrate on existing operations and not new acquisitions. Doc. 63, Part 8, Day Declaration, ¶ 13.  At the meeting, Matvieshen resigned from his positions as CEO, Director, and Chairman of the Board of Sunlogics PLC and Sunlogics INC. Doc. 22, Part 2, Matvieshen Declaration, ¶10.  Matvieshen continued to control Salamon and its subsidiary, Powerfund. While before, Salamon was only involved in the syndication step, Salamon began to undertake whole solar projects. Doc. 63, Part 1, Bryant Declaration, ¶ 32.

Through January 2012, Matvieshen continued to make promises regarding the adjustments and to reassure Bryant and Deliddo of his intent to complete the promised transfers of shares. Doc. 6, Part 1, Bryant Declaration, ¶¶ 13, 33; Doc. 6, Part 3, Ex. M.  However, in March 2012, Matvieshen refused to transfer the shares and began making threats to transfer the shares to other parties. Doc. 6, Part 1, Bryant Declaration, ¶¶ 33-40.  The various share transfers appear to have been undertaken through a company called Computershare. Doc. 4, Complaint, ¶ 37.  Matvieshen continues to control Salamon and Sunlogics PLC stock that, under the MJC Agreement, belongs to Bryant and Deliddo.  Matvieshen also holds Salamon stock that belongs to Sunlogics PLC.  After Matvieshen resigned from Sunlogics INC and PLC, Salamon announced that it was buying Sunlogics PLC stock from Millenium. Doc. 4, Complaint, ¶41. This would be stock subject to the MJC Agreement.

Bryant and Deliddo first filed suit against Matvieshen on April 10, 2012, in the Superior Court for the State of California, County of Fresno. Doc. 4, Complaint.  The case was removed on April 12, 2012.  Bryant and Deliddo filed a motion for a temporary restraining order, which was granted on April 27, 2012 ("First TRO") ordering in relevant part:

> Defendant Michael Matvieshen, his agents, servants, employees, assignees, attorneys and all those acting in concert or participation with him are RESTRAINED AND ENJOINED from taking any actions to sell, transfer, hypothecate or encumber or take any action that would devalue in any manner the shares of common stock of Sunlogics Plc ("Sunlogics") a United Kingdom corporation, Salamon Group, Inc. ("Salamon") a Nevada corporation, Millennium Trends, Inc. ("Millennium"), a Bahamas corporation, or Maverick Group, Inc. ("Maverick') a Swiss corporation, at issue in this case.  Without limitation, this

    specifically extends to entering into any definitive agreement for the transfer of stock from Millennium or Maverick.

Doc. 7, Original TRO, 7:26-8:7. The goal of the First TRO was to protect Bryant's and Deliddo's ownership interests under the MJC Agreement. A preliminary injunction hearing was held on May 10, 2012. After considering the arguments of the parties, the court indicated that a preliminary injunction was appropriate. Up through that point, the parties had been arguing in terms of percentages; they had not indicated the exact number of shares of Sunlogics PLC or Salamon that constituted the 30-30-40 covered by the MJC Agreement. The parties were ordered to meet and confer to come up with language for the preliminary injunction which would be more specific.

    At the May 10, 2012 hearing, it was determined that the First TRO had to be modified in three ways. First, the language "or take any action that would devalue in any manner" was eliminated. Matvieshen remained the CEO/head of Salamon, Millennium, and Maverick. He had to make business decisions which might affect the value of these companies. As the First TRO was limited to preserving Bryant's and Deliddo's ownership interests and not intended to interfere withe Matvieshen's flexibility in running the companies, the language was deleted. Second, the First TRO prohibited Matvieshen from selling any of the specified stock, even his own 40%. The restrictions on Matvieshen's 40% interest were lifted. Third, the court clarified that the restrictions do not apply to Sunlogics PLC or Salamon stock owned by Epod or ICP (the up to 9,000,000 shares given to those companies in exchange for assets transferred to Sunlogics PLC). The terms of the First TRO, with these three modifications, constitute the Second TRO, effective May 10, 2012.

    Bryant and Deliddo moved to have the Second TRO modified. Doc. 20. Salamon scheduled a general shareholders meeting on May 30, 2012 for the purpose of issuing 250 million shares of additional stock and to create a new preferred class of stock with 200 times the voting power of common stock and to change Salamon's name to "Sunlogics Powerfund Inc." Doc. 20, Part 4, Bryant Declaration, ¶¶ 9-10; Doc, 20, Part 3, Brief, 3:13. Bryant and Deliddo also outlined numerous transfers of Sunlogics PLC stock held by Matvieshen, Epod , and ICP that

were subject to the MJC Agreement:

> on April 30, 2012, MATVIESHEN initiated share transfers of Sunlogics Plc stock, including the transfer of (a) 3,728,342 shares of Sunlogics Plc stock held by MATVIESHEN personally to Salamon Group, Inc.; (b) 7,500,000 shares of Sunlogics Plc stock purportedly held by Epod Ventures, Inc. to Salamon Group, Inc.; (c) 2,000,000 shares of Sunlogics Plc stock purportedly held by 531682 BC Ltd1 to Shari Matvieshen (Defendant MATVIESHEN's wife); (d) 225,000 shares of Sunlogics Plc stock purportedly held by ICP Solar Technologies, Inc. to Ryan Husch2, 250,000 shares to Denis Husch, and 100,000 shares to Nicholas Husch; and (e) 925,000 shares of Sunlogics Plc stock purportedly held by ICP Solar Technologies, Inc. to Salamon Group, Inc....The transfer from MATVIESHEN to Salamon is a clear violation of the TRO and the other transfers demonstrate a clear propensity of MATVIESHEN to violate court orders.

Doc. 20, Part 3, Brief, 2:15-3:3. Bryant and Deliddo sought an order preventing Matvieshen from voting any of his Salamon stock, prohibiting the issuance of 250 million shares of new common stock, prohibiting the creation of preferred stock, prohibiting any name changes, and stopping the transfer of the Sunlogics PLC stock. A hearing was held on May 29, 2012. Bryant's and Deliddo's requests were largely denied. The Second TRO was only modified to ensure that Bryant and Deliddo were able to vote their combined 50% interest under the MJC even if the shares were currently in the hands of Matvieshen ("Third TRO"). Doc. 25. The court did not order any stop to or interference with the shareholders meeting scheduled for May 30, 2012. Nevertheless, there is no indication that meeting ever took place. Doc. 63, Part 1, Bryant Declaration, ¶34. As far as can be determined, there are still only 46 million shares of Salamon stock.[2]

The parties were ordered to meet and confer regarding language for a preliminary injunction. The order was issued June 8, 2012 ("First PI"), and stated that Matvieshen (and those in concert with him) were enjoined from transferring, selling, hypothercating, encumbering, or cancelling certain stock or warrants that he held in Salamon and Sunlogics PLC and Millenium held in Sunlogics PLC. Doc. 30. For Salamon, the First PI covers ownership of the 20 million

---

[2] There are conflicting statements as to how many shares of Salamon are outstanding. The court assumes there are 46 million (26 million before the purchase from Spaceglobe plus 20 million Matvieshen issued to himself). Doc. 62, Counterclaim, ¶¶ 15 and 21. Bryant now claims there are 42 million shares. Doc. 63, Part 1, Bryant Declaration, ¶ 33. However, he earlier claimed there were 40 million shares. Doc. 6, Part 1, Bryant Declaration, ¶ 36(f). For now, the court will assume that there are 46 million and treating the 20 million warrants separately. The court does note that in filing with the SEC, Matvieshen reported the creation of 40 million new shares of stock. Doc. 63, Part 14, Ex. E.

shares and 20 million warrants Matvieshen had issued to himself. The First PI specifically deals with 12 million shares of Salamon (60% of the 20 million); it does not deal with the 16 million shares Sunlogics INC purchased from Spaceglobe. For Sunlogics PLC, the First PI covers ownership of 2,481,073 shares held by Matvieshen and 5.5 million shares held by Millenium. As stated before, Bryant and Deliddo have only received 2,446,415 shares of Sunlogics PLC though each is entitled to 7,986,978 shares. Doc. 4, Complaint, ¶ 38.

Meanwhile, additional parties have entered the litigation. Matvieshen filed suit against Bryant, Deliddo, GM, Tenor Opportunity Master Fund, Ltd., GLG North American Opportunity Fund, and Atlas Investment Fund. Doc. 32. On May 9, 2012, Matvieshen filed suit against Sunlogics INC and PLC Doc. 17. Matvieshen seeks to enforce an indemnification provision in his Employment Agreement. In response to the claim for indemnification, on September 28, 2012, Sunlogics INC and PLC filed a counterclaim. Doc. 62. This counterclaim forms the basis for the present motion for a TRO. Doc. 63. Daystar Solar Technologies, Inc. ("Daystar"), is a Delaware corporation with its corporate headquarters in Milpitas, California. On August 23, 2012, Daystar made a tender offer for a majority interest in Salamon. Doc. 62, Counterclaim, ¶34. Daystar offered to exchange one share of Daystar stock for every six shares of Salamon. If shareholders owning more than 50% of the common shares in Salamon agreed, the exchange would go forward. Sunlogics INC and Sunlogics PLC filed suit against Matvieshen, Salamon, Powerfund, and Daystar. They allege, among other things, that Daystar is working with Matvieshen to keep Sunlogics INC and PLC from gaining control of the 9 million shares of Salamon stock that was purchased from Spaceglobe but is still in Matvieshen's name.

Bryant, Deliddo, Sunlogics INC, and Sunlogics PLC ("Sunlogics Group") are all represented by the same attorney and seek a wide ranging TRO against Matvieshen, Salamon, Powerfund, and Daystar. Whereas the prior TROs and First PI dealt with the interests of Bryant and Deliddo under the MJC Agreement, the present motion also deals with SUNLOGICS Inc's and PLC's interests in Salamon under the initial purchase of 16 million shares from Spaceglobe. Of particular note, the Sunlogics Group asks that Salamon itself be put into receivership. Since the filing of the motion for TRO, on October 2, 2012, Daystar has announced that it was no

longer seeking to make a tender offer for a majority of Salamon at this time. See

http://money.cnn.com/news/newsfeeds/articles/globenewswire/10006971.htm.

## II. Legal Standards

The substantive standard for granting a temporary restraining order is the same as the standard for entering a preliminary injunction. Bronco Wine Co. v. U.S. Dep't of Treasury, 997 F.Supp. 1309, 1313 (E.D. Cal. 1996); Lockheed Missile & Space Co. v. Hughes Aircraft Co., 887 F.Supp. 1320, 1323 (N.D. Cal. 1995). A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 374 (2008); Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust, 636 F.3d 1150, 1160 (9th Cir. 2011). "Injunctive relief...must be tailored to remedy the specific harm alleged." Park Vill., 636 F.3d at 1160.

## III. Discussion

### A. Daystar's Tender Offer for Salamon

The Sunlogics Group seeks "to enjoin SALAMON and [Daystar] from moving forward with any vehicle for combining SALAMON and DAYSTAR, including but not limited to a tender offer for the shares of SALAMON." Doc. 63, 2:5-7. However, since Daystar is no longer making a tender offer, there is no imminence to the harm.

To be clear, the Preliminary Injunction specifically states, "Defendant Michael Matvieshen, his agents, servants, employees, assignees, attorneys, and all those acting in concert or participation with him are RESTRAINED AND ENJOINED from taking any of the following actions: (a) Transferring, selling, hypothecating, encumbering, or canceling any of the following shares of stock and/or warrants: (i) 8,505,119 shares of Salamon Group, Inc. stock held by Michael Matvieshen individually; (ii) 20,000,000 warrants of Salamon Group, Inc. held by Michael Matvieshen individually; (iii) Any additional shares of Salamon Group, Inc. that

Michael Matvieshen may acquire while this order is in effect, up to an additional 3,494,881 shares (for a total of 12 Million shares maximum of Salamon Group, Inc. affected under this order)." Doc. 30, 2:7-19.  Though Matvieshen has some voting rights over those shares, he may not sell or exchange any of those shares.  Exchanging those shares for Daystar stock would be a clear violation of the Preliminary Injunction.

**B. Matvieshen's Control of Salamon Shares**

While the First PI froze 12 million shares in Salamon held by Matvieshen that arguably belongs to Bryand and Deliddo under the MJC Agreement, the Sunlogics Group now seeks to protect the ownership interests of Sunlogics INC and PLC.  That interest must be traced back to Sunlogics INC's initial purchase of 16 million shares of Salamon from Spaceglobe, of which 9 million were actually transferred.

The Sunlogics Group asserts "In or about late November 2010, the Salamon SPA was fully executed by MATVIESHEN on behalf of INC, and by John Salamon for Spaceglobe....MATVIESHEN disbursed funds from INC's bank account to pay for the transaction, including transactions costs, as well as $77,000 to pay for the first approximately 9 million shares of SALAMON delivered by Spaceglobe....MATVIESHEN represented to Bryant and Deliddo that a change had been made in the transaction so the Salamon SPA was closed subject to the 40-30-30 MJC Agreement rather than an acquisition by INC; however, MATVIESHEN never transferred any SALAMON shares to BRYANT or DELIDDO pursuant to the MJC Agreement, nor did MATVIESHEN transfer any shares to INC." Doc. 62, Counterclaim, ¶¶ 16-17 and 19. "[I]t is the position of SUNLOGICS PLC and SUNLOGICS INC. that SUNLOGICS INC. is entitled to a controlling interest in SALAMON. The SUNLOGICS PLC Board is also aware that BRYANT and DELIDDO have a claim to the same shares." Doc. 63, Part 8, Day Declaration, ¶ 21.  Sunlogics INC seeks to have all 9 million shares frozen.

Bryant states "Around November 2010, MATVIESHEN requested permission from me and DELIDDO to acquire SALAMON, presumably for [tax credit] deals. We agreed that

11

POWERFUND and SALAMON would both be a part of our 40-30-30 agreement although it was originally contemplated that SALAMON would be a subsidiary of SUNLOGICS INC....In November 2011, when I asked why the shares that had already been delivered were not transferred out of Spaceglobe's name and reissued pursuant to the MJC Agreement, Harold Schneider [Matvieshen's assistant] responded to my emails indicating that MATVIESHEN was going to transfer shares into my name and into DELIDDO's name." Doc. 63, Part 1, Bryant Declaration, ¶¶ 7 and 13.  That is, Bryant asserts that Matvieshen purchased Salamon from Spaceglobe for Matvieshen, Bryant, and Deliddo, not Sunlogics INC.  Under this theory, the court should freeze 60% of the 9 million shares under the MJC Agreement.

      The written agreement for the purchase of Salamon is ambiguous.  An original agreement signed November 12, 2010 specified that Sunlogics INC was the purchaser. Doc. 63, Part 5, Ex. E., pages 3-4 of 5.  However, on December 7, 2010, an amended agreement made both Sunlogics INC and Matvieshen purchasers of Salamon; it was signed by Matvieshen on behalf of Sunlogics INC and John Salamon on behalf of Spaceglobe. Doc. 63, Part 6, pages 6-7 of 7.  Bryant and Sunlogics INC are making conflicting claims on the 9 million shares.  It is not clear who owns them (Sunlogics INC vs. Matvieshen, Bryant, and Deliddo).  The different ownership claims would give rise to substantively different injunctions.  No temporary restraining order can be granted on this evidence.  Further, it would appear that Bryant's and Deliddo's interests are adverse to Sunlogics INC's and PLC's interests in this case.

**C. Non-Compete Employment Clause**

      Sunlogics INC and PLC state "MATVIESHEN's Employment Agreement with INC...provides that MATVIESHEN cannot compete with INC during his employment and for a period of two (2) years thereafter....After November 2011 and despite his Employment Agreement, MATVIESHEN continued his involvements as a Director and as the CEO of both SALAMON and POWERFUND." Doc. 62, 38:19-27.  The employment agreement reads "It is agreed that the Employee shall not, directly or indirectly during his employment and for two years thereafter, compete directly or indirectly with the Company in his individual capacity or as

a proprietor, employee, agent, consultant, director, officer, partner or a five-percent shareholder of any business or other entity which is (x) engaged in the development, sale, marketing, manufacture or installation of any type of product sold, developed, marketed, manufactured or installed by the Company during the Employee's employment with the Company, including solar charging stations, ground mount solar installations, rooftop solar installations or (y) is in direct competition or that would be in direct competitions with the business of the Company as that business exists and is conducted during the Employee's employment with the Company." Doc. 63, Part 9, Ex. A, 8. The Sunlogics Group asserts that Matvieshen's employment by Salamon and Powerfund violates the non-compete clause and so seek to "enjoin[] Matvieshen from acting as a Director or Officer/CEO of Salamon or [Powerfund]." Doc. 63, 7:18-20 and 11:4-19. The Sunlogics Group has provided no legal authority concerning preliminary injunctive relief on this claim.

On the merits of the claim, there is confusion as to what law should apply. In the relevant complaint, Sunlogics INC and PLC allege "breach of contract" without stating what jurisdiction's laws apply. Doc. 62, Counterclaim, 61:16-63:3. In briefing for the TRO on this issue, the Sunlogics Group cites to California case law for defining breach of contract and Canadian case law for enforcement of non-compete clauses. The court is not certain as to whether Sunlogics INC and PLC are bringing a California or Canadian claim. Under California law, "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. "The two exception are: where the party sought to be restrained has sold a business to, or has been in a partnership with, the party seeking the restraint." Robinson v. Jardine Ins. Brokers Int'l, 856 F. Supp. 554, 558 (N.D. Cal. 1994). "Section 16600 has specifically been held to invalidate employment contracts which prohibit an employee from working for a competitor when the employment has terminated, unless necessary to protect the employer's trade secrets." Metro Traffic Control, Inc. v. Shadow Traffic Network, 22 Cal. App. 4th 853, 859 (Cal. App. 2d Dist. 1994), citing Muggill v. Reuben H. Donnelley Corp., 62 Cal. 2d 239, 242 (Cal. 1965). the current Chairman of the Board of directors of Sunlogics PLC states

"MATVIESHEN, as a Director and CEO, had the highest levels of access to confidential, proprietary, and commercially sensitive information and has shown no hesitation in using it against SUNLOGICS PLC and SUNLOGICS INC in precisely the manner the non-compettion provision was designed to prevent and beyond." Doc. 63, Part 8, Day Declaration, ¶ 10. However, there is no description of how Matvieshen has been using Sunlogics INC's and PLC's trade secrets, only a claim that "The threat of harm is underscored by MATVIESHEN's successive breaches of his fiduciary duties to INC and PLC (and SALAMON) of such magnitude that it resulted in the PLC Board demanding MATVIESHEN's resignation." Doc. 63, 28:20-23. The Sunlogics Group has not yet shown how the non-competition clause in the employment contract is consistent with California law.  There is no likelihood of success on the merits.

**D. Trademark Infringement**

Sunlogics INC and PLC allege that Salamon and Powerfund are violating federal trademark law by "(a) use of the 'Sunlogics' tradename and marks; (b) use of the Sunlogics Logo; and (c) representations that SALAMON or POWERFUND is a 'project-acquiring partner of PLC,' all displayed on the SALAMON and POWERFUND joint website at sunlogicspower.com." Doc. 62, 55:18-21.  They also allege violations of California's unfair competition law based on the same facts. Doc. 62, 50:3-51:20.  The Sunlogics Group now seeks "to enjoin SALAMON and its wholly-owned subsidiary POWERFUND from (i) engaging in unfair competition against PLC or INC by utilizing PLC and INC's tradename and logo trademarks protected by common law rights or (ii) otherwise misleading consumers by false advertising on the SALAMON/POWERFUND website or in any other type of advertising or publication by SALAMON or POWERFUND, including representations that PLC or INC is a 'partner' of SALAMON or POWERFUND." Doc. 63, 1:25-2:2.

"To prevail on its claim of trademark infringement, the State must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon the State's rights to the mark." Department of Parks and Recreation v. Bazaar Del Mundo, Inc., 448 F.3d 1118, 1124 (9th Cir. 2006). "[I]n

order to show a probability of success in the causes of action for trademark infringement, false designation of origin and unfair competition, [parties] need show that a likelihood of confusion exists." Sardi's Restaurant Corp. v. Sardie, 755 F.2d 719, 723 (9th Cir. 1985), citations omitted. For common law misappropriation under California's unfair competition law, "It is normally invoked in an effort to protect something of value that is not covered either by patent or copyright law on the one hand, or by traditional doctrines of unfair competition, such as trade secret theft or breach of confidential relationship, on the other. The cause of action has three elements: (1) the plaintiff has invested substantial time and money in development of its 'property'; (2) the defendant has appropriated the property at little or no cost; and (3) the plaintiff has been injured by the defendant's conduct." Balboa Ins. Co. v. Trans Global Equities, 218 Cal. App. 3d 1327, 1342 (Cal. App. 3d Dist. 1990), citations omitted. The injury the Sunlogics Group identifies is consumer confusion. Doc. 63, 32:1-3. "The legal framework used to analyze these [state unfair competition] claims is substantially the same as the framework used to evaluate Lanham Act claims under federal law." E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc., 444 F.Supp.2d 1012, 1049 (C.D. Cal. 2006), citations omitted; Aurora World, Inc. v. Ty Inc., 719 F.Supp.2d 1115, 1143-44 (C.D. Cal. 2009) ("the test for...statutory and common law unfair competition claims...is materially the same as the test for the Lanham Act").

  First, Sunlogics INC and PLC have to establish a protectible ownership interest in the marks. There are a few different elements to be analyzed. The Sunlogics Group argues the "general copying of the 'look and feel' of the INC website separately constitutes a violation of common law protections relating to trade dress because a website's total 'look and feel can constitute a protectable trade dress." Doc. 62, 31:17-19. In order to state a trade dress claim for website design, the Sunlogics Group needs to clearly define the specific elements that constitute the trade dress; a general description of the site is insufficient. See Sleep Science Partners v. Lieberman, 2010 WL 1881770, *3 (N.D. Cal. 2010) ("Although it has cataloged several components of its website, Plaintiff has not clearly articulated which of them constitute its purported trade dress"). The briefing points to no such clear definition and so the Sunlogics Group has not established a protectible ownership interest in their website design.

The Sunlogics Group seeks exclusive use of the word "Sunlogics" and an image of a yellow diamond which resembles solar panels they term the "Sunlogics Logo." Doc. 62, 32:5-6. These marks are not registered; the Sunlogics Group seeks protection under common law trademark protection. "[T]he party claiming ownership must have been the first to actually use the mark in the sale of goods or services." Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996). The Sunlogics Group asserts "SUNLOGICS has been building good will in its name and the Sunlogics Logo since 2010 in the field of solar development." Doc. 63, 33:8-9. However, The Sunlogics Group admits that " MATVIESHEN attempted to have SALAMON change its name to 'Sunlogics Power Fund Management, Inc." in May 2012." Doc. 63, 9:25-26. The MJC Agreement, signed December 21, 2010, references the "Salamon Group, Inc. or Sunlogics Power Fund Management Inc." Doc. 4, page 51 of 54. The Sunlogics Group has not argued that they were the first to use the term "Sunlogics" in this commercial field. Bryant notes that Powerfund is only "the subsidiary for Canadian projects." Doc. 63, Part 1, Bryant Declaration, ¶ 35. It is unclear if the Sunlogics Group is seeking to claim first use in the United States as a distinct market. Given that the right to use the very name "Sunlogics" itself is in question, consideration of the associated yellow diamond image is deferred as it would appear to be bound with that question.

**E. Receivership**

The Sunlogics Group also seeks to have Salamon put into receivership. Salamon has only just been named a party in this litigation. Doc. 62, Counterclaim. Salamon has not yet made an appearance in this case. All other requests for injunctive relief in this motion are being denied as the Sunlogics Group has not shown a clear likelihood of success on the merits on many of the requests. The Sunlogics Group appears to have many different causes of action against Matvieshen and his associated companies. The temporary restraining order requests in this motion are very broad but inchoate.

A receivership under Fed. Rule Civ. Proc. 66 is a drastic form of injunctive relief. See Canada

Life Assur. Co. v. LaPeter, 563 F.3d 837, 845 (9th Cir. 2009) ("the appointment of a receiver is an 'extraordinary remedy' under federal law"). The process of receivership would be better determined through a preliminary injunction rather than a TRO.[3] It is questionable that there would even be enough time to set up a receiver given a TRO's short duration.

## IV. Order

Bryant's, Deliddo's, Sunlogics INC's, and Sunlogics PLC's request for a temporary restraining order is DENIED.

IT IS SO ORDERED.

Dated: October 12, 2012

CHIEF UNITED STATES DISTRICT JUDGE

---

[3] Most of the requests for TRO relief contained in this motion would benefit from the fuller development of a motion for preliminary injunction. The extra time might allow for clearer briefing focused on the specific causes of action asserted and case law discussing preliminary injunctive relief granted (and denied) under those factual circumstances.