1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES L. BRYANT and JACK DELIDDO, | 1:12-CV-00572  AWI SKO |
| Plaintiffs, | |
| v. | ORDER RE: MOTION FOR SANCTIONS |
| MICHAEL MATVIESHEN and DOES 1 through 25, inclusive, | (Doc. 31) |
| Defendants. | |

19

## I. History

20    The factual background of this case is complex.  There are four active complaints: the

21 original, two counterclaims, and a counterclaim to a counterclaim.  These complaints appear to

22 contain some inconsistent facts.

23    In 2009, Jack Deliddo ("Deliddo") formed Rooftop Energy, LLC ("Rooftop"), a company

24 specializing in large scale commercial solar projects. Doc. 4, Complaint, ¶ 8.  Shortly thereafter,

25 Deliddo sold a 51% interest in Rooftop to Charles Bryant ("Bryant"). Doc. 4, Complaint, ¶ 9.

26 Plaintiffs entered into discussions with Michael Matvieshen ("Matvieshen") regarding assistance

27 with obtaining solar panels and financing for various large-scale projects, including projects with

28 General Motors ("GM").  Matvieshen already owned a number of corporations involved with

1   solar/electric projects, among them ICP Solar Technologies, Inc. ("ICP"), a subsidiary of Epod
2   Solar, Inc. ("Epod").  In 2010, Matviesen offered to purchase Rooftop from Bryant and Deliddo
3   in exchange for cash and stock in ICP. Doc. 4, Complaint, ¶ 13.  The parties contemplated that
4   ICP would fulfill the GM projects initiated by Rooftop. Doc. 4, Complaint, ¶ 13.  In August
5   2010, Bryant and Deliddo agreed to a sale of 100% of their membership interests in Rooftop to
6   ICP for $3 Million in vested cash payouts, a 20% stock interest in ICP, and
7   employment/consulting agreements ("Rooftop Agreement"). Doc. 6, Part 2, Ex. A; Doc. 4,
8   Complaint, ¶ 13; Doc. 6, Part 7, Deliddo Declaration, ¶ 6; Doc. 6, Part 1, Bryant Declaration, ¶ 9.
9   Bryant and Deliddo, however, never received the cash payment promised, and ICP turned out to
10  have cash flow problems, making it a poor candidate for the potential GM projects. Doc. 4,
11  Complaint, ¶ 14.  Bryant and Deliddo became 10% shareholders in ICP. Doc. 6, Part 1, Bryant
12  Delcaration, ¶ 28.

13          Matviesen represented to Bryant and Deliddo that Sunlogics, Inc. ("Sunlogics INC), a
14  Canadian corporation which was controlled by Matviesen, was in a better position than ICP to
15  pursue the business strategies and GM projects initiated by Rooftop. Doc. 4, Complaint, ¶ 16.  At
16  that time, Matviesen was 100% owner of Sunlogics INC. Doc. 62, Counterclaim, ¶9.  Bryant
17  and Deliddo agreed to allow Matviesen to transfer Rooftop from ICP to Sunlogics INC, and for
18  their consulting contracts to be assigned to Sunlogics INC, in exchange for a 30% interest each in
19  Sunlogics INC. Doc. 4, Complaint, ¶ 16; Doc. 6, Part 7, Deliddo Declaration, ¶¶ 7-8; Doc. 6, Part
20  1, Bryant Declaration, ¶¶ 9-11.  On September 14, 2010, Deliddo was made a member of the
21  Board of Directors of Sunlogics INC. Doc. 4, Complaint, ¶ 20.  The parties restructured the
22  companies in January 2011, agreeing that Sunlogics, Plc ("Sunlogics PLC") would become the
23  parent of Sunlogics INC which was the parent of Rooftop. Doc. 62, Counterclaim, ¶¶ 10 and 12.
24  Sunlogics PLC is a British company, created in July 2010 whose shares are traded on the
25  Frankfurt stock exchange. Doc. 4, Complaint, ¶ 17.  Bryant, Deliddo, and Matvesen became
26  members of the Board of Directors of Sunlogics PLC. Doc. 62, Counterclaim, ¶ 12.  In 2011,
27  Rooftop's name was officially changed to Sunlogics Energy Solutions, LLC. Doc. 62,
28  Counterclaim, ¶ 9.

In November 2010, Matvieshen discussed with Bryant and Deliddo the possibility of Sunlogics INC acquiring Salamon Group, Inc. ("Salamon"), a publically traded company incorporated in Nevada. Doc. 62, Counterclaim, ¶ 14.  Salamon was a solar power syndication (which appears to be a form of financing) company. Doc. 63, Part 1, Bryant Declaration, ¶ 32.  It is unclear whether Bryant and Deliddo gave Matvieshen permission to go forward with the transaction or if they had any ownership interest of Sunlogics INC at that time. Doc. 63, 6:16-18. In November 2010, there were 26 million shares of Salamon.  Matvieshen arranged for Sunlogics INC to purchase 16 million shares from Space Globe Technologies, Inc. ("Space Globe"). Doc. 62, Counterclaim, ¶15.  Bryant asserts that Matvieshen was purchasing Salamon for the Matvieshen, Bryant, and Deliddo group.  Sunlogics INC used funds from Rooftop to pay Space Globe. Doc. 6, Part 1, Bryant Declaration, ¶ 12.  Though 16 million shares were purchased, only 9 million shares were officially transferred. Doc. 62, Counterclaim, ¶ 17.  These shares were transferred to Matvieshen personally instead of Sunlogics INC or Bryant and Deliddo; the 9 million shares are in Matvieshen's name. Doc. 62, Counterclaim, ¶¶ 18-20.  Apparently, control over the remainder of Salamon shares (approximately 7 or 8 million) is disputed, with those shares still in the name of Space Globe. Doc. 4, Complaint, ¶24.  The nature of that dispute is unknown and it is not exactly clear how that dispute affects this case.  Matvieshen took control of Salamon by December 2010 and completed a reverse merger with Sunlogics Power Fund Management, Inc. ("Powerfund"). Doc. 62, Counterclaim, ¶ 21.  Matvieshen created Powerfund in July 2010. Doc. 4, Complaint, ¶ 17.  Powerfund is a Canadian corporation. Doc. 62, Counterclaim, ¶ 3.  As payment for Powerfund, Matvieshen had an additional 20 million shares of Salamon and 20 million shares of Salamon warrants created and given to himself. Doc. 62, Counterclaim, ¶ 21.  Thus, it is estimated that Matvieshen had 29 million shares of Salamon in his name, out of a total of 46 million shares in early 2011.  On May 2, 2011, Sunlogics INC and Powerfund signed a right of first refusal agreement. Doc. 62, Counterclaim, ¶24.  Salamon currently claims to have the rights of first offer to purchase GM projects from Sunlogics INC. Doc. 4, Complaint, ¶ 25; Doc. 62, Counterclaim, ¶26.

To effectuate the division of ownership in these companies, Matvieshen, Bryant, and

Deliddo signed an agreement on December 10, 2010 ("MJC Agreement"). Doc. 4, pages 51-53 of 54. Among other things, the MJC Agreement provides that Matvieshen was "the directing shareholder" of Sunlogics PLC and Salamon. Doc. 4, Ex. A, ¶ 1. The MJC Agreement further provides that Matvieshen was "holding shares in trust" for Bryant and Deliddo, and that Matvieshen "agrees to transfer 60% of such ownership interests held by [Matvieshen], 30% to [Deliddo] and 30% to [Bryant]" in Sunlogics PLC and Salamon. Doc. 4, Ex. A, ¶ 1. The MJC Agreement also provides that Matvieshen will have a 40% interest and Bryant and Deliddo will each have a 30% interest "in any and all companies in which they participate together presently or in the future. . .." Doc. 4, Ex. A, ¶ 2. The MJC Agreement stated that "Although the stock ownership will be 30%-30%-40% as between [Deliddo, Bryant, and Matvieshen], as to each of the entities, the parties agree that the voting rights for any entity in which (sic) as between the parties will be as follows: [Matvieshen] 50%, [Bryant] 25%, [Deliddo] 25%. The parties agree to vote their stock in accordance with this agreement." Doc. 4, Ex. A, ¶ 3. The MJC Agreement expressly contemplated that Matvieshen, Bryant, and Deliddo would not be the sole owners of these companies. The ownership and voting ratios applied to the portion of these companies they owned. Of note, the MJC Agreement referred to "Salamon Group, Inc. or Sunlogics Power Fund Management Inc." suggesting that the merger between Salamon and Powerfund had already taken place by the time the MJC Agreement was signed.

Meanwhile separate from the dealings described above, in October 2010, Sunlogics INC (then controlled by Matvieshen) entered into a merger agreement with Phoenix Solar Holdings, Inc.[1] ("Phoenix"), collection of affiliated companies; the agreement was completed on June 10, 2011. Doc. 62, Counterclaim, ¶ 11. With all of the mergers, the companies headed by Sunlogics PLC was becoming a vertically integrated solar energy development company. It is assumed, Matvieshen controlled Sunlogics INC, Sunlogics PLC, Powerfund, and Salamon (after the purchase from Space Globe) in some manner. It is not clear what titles Matvieshen held at these companies in the time frame at issue. The merger between Sunlogics INC and PLC with Phoenix

---

[1] Phoenix Solar Holdings is called both an Inc. and a Corp. See Doc. 62, Counterclaim, ¶ 11; Doc. 4, Complaint, ¶ 28. The court assumes that these terms are referring to the same entity.

was accomplished through some form of share exchange. Doc. 62, Counterclaim, ¶ 11.  While Sunlogics PLC and Salamon are publically traded companies, it is unclear whether shares for Sunlogics INC or Powerfund exist.  Notwithstanding the MJC Agreement (which explicitly covered ownership of Sunlogics PLC and Salamon), all relevant shares were held by Matvieshen through June 2011 to complete the merger with Phoenix. Doc. 4, Complaint, ¶ 29.  At the time of the merger, there were a total of 32 million shares in Sunlogics PLC of which 16.5 million were subject to the MJC Agreement. Doc. 4, Complaint, ¶ 34.  Additionally, 9 million shares were set aside to be used to buy certain of Epod and ICP's assets; Matvieshen represented to Bryant and Deliddo that any excess shares from the 9 million would be reallocated among themselves using the 30-30-40 formula. Doc. 4, Complaint, ¶ 35.

During the time this merger was pending, Bryant, Deliddo, and Matvieshen agreed to the formation of two offshore companies, Millennium Trends International, Inc., a Bahamas company ("Millennium"), and Maverick Ventures SA, a Swiss company ("Maverick"), that would also be subject to the MJC Agreement. Doc. 4, Complaint, ¶ 30; Doc. 6, Part 7, Deliddo Declaration, ¶ 16; Doc. 6, Part 1, Bryant Declaration, ¶¶ 18, 25.  Some of Bryant's and Deliddo's shares in Sunlogics PLC under the MJC Agreement were held by Millenium and/or Maverick. Doc. 4, Complaint, ¶ 36.  In July 2011, GM invested $7,500,000 in Sunlogics PLC in exchange for 14% of the company. Doc. 6, Part 1, Bryant Declaration, ¶ 27.  There was a non-dilution agreement so additional shares were issued to Bryant, Deliddo, and Matvishen. Doc. 4, Complaint, 14:23-25.  The total number of shares in Sunlogics PLC becomes unclear at this point.  Bryant and Deliddo have only received 2,446,415 shares of Sunlogics PLC though each is entitled to 7,986,978 shares. Doc. 4, Complaint, ¶ 38.

On June 10, 2011, Matvieshen and Sunlogics INC signed an employment agreement ("Employment Agreement"). Doc. 63, Part 9, Ex A.  In September 2011, Matvieshen approached the Board of Directors of Sunlogics PLC with a proposal to purchase Arise Solar Technologies, Inc. ("Arise"); the Sunlogics PLC Board denied the request. Doc. 62, Counterclaim, ¶ 28.  Matvieshen had Salamon purchase Arise, using more than $200,000 from Sunlogics INC's bank accounts. Doc. 62, Counterclaim, ¶ 28.  On November 17, 2011, the Board of Directors of

1    Sunlogics PLC called a special meeting an confronted Matvieshen about his purchase of Arise.

2    Doc. 62, Counterclaim, ¶ 29.  Matvieshen was also confronted about his attempts to buy

3    additional companies, Revergy and Energy Conversion Devices, after the Board of Directors told

4    him to concentrate on existing operations and not new acquisitions. Doc. 63, Part 8, Day

5    Declaration, ¶ 13.  At the meeting, Matvieshen resigned from his positions as CEO, Director, and

6    Chairman of the Board of Sunlogics PLC and Sunlogics INC. Doc. 22, Part 2, Matvieshen

7    Declaration, ¶10.  Matvieshen continued to control Salamon and its subsidiary, Powerfund.

8    While before, Salamon was only involved in the syndication step, Salamon began to undertake

9    whole solar projects. Doc. 63, Part 1, Bryant Declaration, ¶ 32.

10         Through January 2012, Matvieshen continued to make promises regarding the

11   adjustments and to reassure Bryant and Deliddo of his intent to complete the promised transfers

12   of shares. Doc. 6, Part 1, Bryant Declaration, ¶¶ 13, 33; Doc. 6, Part 3, Ex. M.  However, in

13   March 2012, Matvieshen refused to transfer the shares and began making threats to transfer the

14   shares to other parties. Doc. 6, Part 1, Bryant Declaration, ¶¶ 33-40.  The various share transfers

15   appear to have been undertaken through a company called Computershare. Doc. 4, Complaint, ¶

16   37.  Matvieshen argues that these Sunlogics PLC shares (from himself and other parties) were in

17   fact sold to Salamon in January 2012 in return for a convertible debenture. Doc. 35, Part 1,

18   Matvieshen Declaration, 2:9-23.  Bryant and Deliddo dispute this fact.  Matvieshen continues to

19   control Salamon and Sunlogics PLC stock that, under the MJC Agreement, belongs to Bryant

20   and Deliddo.  Matvieshen also holds Salamon stock that belongs to Sunlogics PLC.  After

21   Matvieshen resigned from Sunlogics INC and PLC, Salamon announced that it was buying

22   Sunlogics PLC stock from Millenium. Doc. 4, Complaint, ¶41.  This would be stock subject to

23   the MJC Agreement.

24         Bryant and Deliddo first filed suit against Matvieshen on April 10, 2012, in the Superior

25   Court for the State of California, County of Fresno. Doc. 4, Complaint.  The case was removed

26   on April 12, 2012.  Bryant and Deliddo filed a motion for a temporary restraining order, which

27   was granted on April 27, 2012 ("First TRO") ordering in relevant part:

28         Defendant Michael Matvieshen, his agents, servants, employees, assignees, attorneys and

6

1  all those acting in concert or participation with him are RESTRAINED AND ENJOINED
2  from taking any actions to sell, transfer, hypothecate or encumber or take any action that
   would devalue in any manner the shares of common stock of Sunlogics Plc ("Sunlogics")
3  a United Kingdom corporation, Salamon Group, Inc. ("Salamon") a Nevada corporation,
   Millennium Trends, Inc. ("Millennium"), a Bahamas corporation, or Maverick Group,
4  Inc. ("Maverick') a Swiss corporation, at issue in this case.  Without limitation, this
   specifically extends to entering into any definitive agreement for the transfer of stock
5  from Millennium or Maverick.

6  Doc. 7, Original TRO, 7:26-8:7.  The goal of the First TRO was to protect Bryant's and

7  Deliddo's ownership interests under the MJC Agreement.  A preliminary injunction hearing was

8  held on May 10, 2012.  After considering the arguments of the parties, the court indicated that a

9  preliminary injunction was appropriate.  Up through that point, the parties had been arguing in

10  terms of percentages; they had not indicated the exact number of shares of Sunlogics PLC or

11  Salamon that constituted the 30-30-40 covered by the MJC Agreement.  The parties were ordered

12  to meet and confer to come up with language for the preliminary injunction which would be more

13  specific.

14        At the May 10, 2012 hearing, it was determined that the First TRO had to be modified in

15  three ways.  First, the language "or take any action that would devalue in any manner" was

16  eliminated.  Matvieshen remained the CEO/head of Salamon, Millennium, and Maverick.  He

17  had to make business decisions which might affect the value of these companies.  As the First

18  TRO was limited to preserving Bryant's and Deliddo's ownership interests and not intended to

19  interfere withe Matvieshen's flexibility in running the companies, the language was deleted.

20  Second, the First TRO prohibited Matvieshen from selling any of the specified stock, even his

21  own 40%.  The restrictions on Matvieshen's 40% interest were lifted.  Third, the court clarified

22  that the restrictions do not apply to Sunlogics PLC or Salamon stock owned by Epod or ICP (the

23  up to 9,000,000 shares given to those companies in exchange for assets transferred to Sunlogics

24  PLC).  The terms of the First TRO, with these three modifications, constitute the Second TRO,

25  effective May 10, 2012.

26        Bryant and Deliddo moved to have the Second TRO modified.  Doc. 20.  Salamon

27  scheduled a general shareholders meeting on May 30, 2012 for the purpose of issuing 250 million

28  shares of additional stock and to create a new preferred class of stock with 200 times the voting

1  power of common stock and to change Salamon's name to "Sunlogics Powerfund Inc." Doc. 20,

2  Part 4, Bryant Declaration, ¶¶ 9-10; Doc, 20, Part 3, Brief, 3:13.  Bryant and Deliddo also

3  outlined a numerous transfers of Sunlogics PLC stock held by Matvieshen, Epod , and ICP that

4  were subject to the MJC Agreement:

> on April 30, 2012, MATVIESHEN initiated share transfers of Sunlogics Plc stock, including the transfer of (a) 3,728,342 shares of Sunlogics Plc stock held by MATVIESHEN personally to Salamon Group, Inc.; (b) 7,500,000 shares of Sunlogics Plc stock purportedly held by Epod Ventures, Inc. to Salamon Group, Inc.; (c) 2,000,000 shares of Sunlogics Plc stock purportedly held by 531682 BC Ltd1 to Shari Matvieshen (Defendant MATVIESHEN's wife); (d) 225,000 shares of Sunlogics Plc stock purportedly held by ICP Solar Technologies, Inc. to Ryan Husch2, 250,000 shares to Denis Husch, and 100,000 shares to Nicholas Husch; and (e) 925,000 shares of Sunlogics Plc stock purportedly held by ICP Solar Technologies, Inc. to Salamon Group, Inc....The transfer from MATVIESHEN to Salamon is a clear violation of the TRO and the other transfers demonstrate a clear propensity of MATVIESHEN to violate court orders.

11  Doc. 20, Part 3, Brief, 2:15-3:3.  Bryant and Deliddo sought an order preventing Matvieshen

12  from voting any of his Salamon stock, prohibiting the issuance of 250 million shares of new

13  common stock, prohibiting the creation of preferred stock, prohibiting any name changes, and

14  stopping a plan to prepay Matvieshen for the convertible debenture he received in conjunction

15  with the contested sale of Sunlogics PLC stock.  A hearing was held on May 29, 2012.  Bryant's

16  and Deliddo's requests were largely denied.  The Second TRO was only modified to ensure that

17  Bryant and Deliddo were able to vote their combined 50% interest under the MJC even if the

18  shares were currently in the hands of Matvieshen ("Third TRO"). Doc. 25.  The court did not

19  order any stop to or interference with the shareholders meeting scheduled for May 30, 2012.

20  Nevertheless, the meeting apparently never took place. Doc. 63, Part 1, Bryant Declaration, ¶34;

21  Doc. 35, Part 1, Matvieshen Declaration, 5:11-19.  As far as can be determined, there are still

22  only 46 million shares of Salamon stock.[2]

23      The parties were ordered to meet and confer regarding language for a preliminary

---

[2]There are conflicting statements as to how many shares of Salamon are outstanding.  The court assumes there are 46 million (26 million before the purchase from Space Globe plus 20 million Matvieshen issued to himself). Doc. 62, Counterclaim, ¶¶ 15 and 21.  Bryant now claims there are 42 million shares. Doc. 63, Part 1, Bryant Declaration, ¶ 33.  However, he earlier claimed there were 40 million shares. Doc. 6, Part 1, Bryant Declaration, ¶ 36(f).  For now, the court will assume that there are 46 million and treating the 20 million warrants separately.  The court does note that in filing with the SEC, Matvieshen reported the creation of 40 million new shares of stock. Doc. 63, Part 14, Ex. E.

injunction.  The order was issued June 8, 2012 ("First PI"), and stated that Matvieshen (and those in concert with him) were enjoined from transferring, selling, hypothecating, encumbering, or cancelling certain stock or warrants that he held in Salamon and Sunlogics PLC and Millenium held in Sunlogics PLC.  Doc. 30.  For Salamon, the First PI covers ownership of the 20 million shares and 20 million warrants Matvieshen had issued to himself.  The First PI specifically deals with 12 million shares of Salamon (60% of the 20 million); it does not deal with the 16 million shares Sunlogics INC purchased from Space Globe.  For Sunlogics PLC, the First PI covers ownership of 2,481,073 shares held by Matvieshen and 5.5 million shares held by Millenium.  As stated before, Bryant and Deliddo have only received 2,446,415 shares of Sunlogics PLC though each is entitled to 7,986,978 shares. Doc. 4, Complaint, ¶ 38.

Meanwhile, additional parties have entered the litigation.  Matvieshen filed suit against Bryant, Deliddo, GM, Tenor Opportunity Master Fund, Ltd., GLG North American Opportunity Fund, and Atlas Investment Fund. Doc. 32.  On May 9, 2012, Matvieshen filed suit against Sunlogics INC and PLC Doc. 17.  Matvieshen seeks to enforce an indemnification provision in his Employment Agreement.  In response to the claim for indemnification, on September 28, 2012, Sunlogics INC and PLC filed a counterclaim. Doc. 62.  This counterclaim forms the basis for the present motion for a TRO. Doc. 63.  Daystar Solar Technologies, Inc. ("Daystar"), is a Delaware corporation with its corporate headquarters in Milpitas, California.  On August 23, 2012, Daystar made a tender offer for a majority interest in Salamon. Doc. 62, Counterclaim, ¶34.  Daystar offered to exchange one share of Daystar stock for every six shares of Salamon.  If shareholders owning more than 50% of the common shares in Salamon agreed, the exchange would go forward.  Sunlogics INC and Sunlogics PLC filed suit against Matvieshen, Salamon, Powerfund, and Daystar.  They allege, among other things, that Daystar is working with Matvieshen to keep Sunlogics INC and PLC from gaining control of the 9 million shares of Salamon stock that was purchased from Space Globe but is still in Matvieshen's name.

Bryant, Deliddo, Sunlogics INC, and Sunlogics PLC ("Sunlogics Group") are all represented by the same attorney and seek a wide ranging TRO against Matvieshen, Salamon, Powerfund, and Daystar.  Whereas the prior TROs and First PI dealt with the interests of Bryant

and Deliddo under the MJC Agreement, the present motion also deals with Sunlogics INC's and PLC's interests in Salamon under the initial purchase of 16 million shares from Space Globe.  Of particular note, the Sunlogics Group asks that Salamon itself be put into receivership.  Since the filing of the motion for TRO, on October 2, 2012, Daystar has announced that it was no longer seeking to make a tender offer for a majority of Salamon at this time. See http://money.cnn.com/news/newsfeeds/articles/globenewswire/10006971.htm.

## II. Legal Standards

Title 18 U.S.C. §401 states, "A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as-- (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) Misbehavior of any of its officers in their official transactions; (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."  Civil contempt is encompassed within this statute. See Britton v. Co-Op Banking Group, 916 F.2d 1405, 1409 n.4 (9th Cir. 1990).

In one case, the Ninth Circuit overturned a trial court's finding that a party committed civil contempt for failing to comply with a TRO on the basis that the trial court's TRO was "improperly issued ex parte and failed to describe the prohibited conduct with specificity." Reno Air Racing Ass'n v. McCord, 452 F.3d 1126, 1134 (9th Cir. 2006).  Nevertheless, the court determined that, "Civil contempt in this context consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply. The contempt need not be willful; however, a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the court's order." Reno Air Racing Ass'n v. McCord, 452 F.3d 1126, 1130 (9th Cir. 2006), quotations omitted.  "Whether contempt is civil or criminal depends on the intended effect of the penalty imposed. If the intent is remedial, or if the penalty is conditional in that it is meant to compel the defendant to act, the contempt is civil. If the intent is punitive and the penalty is unconditional, the contempt is criminal." United States v. Laurins, 857 F.2d 529, 534 (9th Cir. 1988).  The U.S. Supreme Court

has stated, "A contempt fine accordingly is considered civil and remedial if it either coerces the defendant into compliance with the court's order, or compensates the complainant for losses sustained. Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge. Thus, a flat, unconditional fine totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." Int'l Union v. Bagwell, 512 U.S. 821, 829 (1994). "Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy." United States v. United Mine Workers, 330 U.S. 258, 304 (1947). That is, "The validity of a civil contempt adjudication turns on the legitimacy of the underlying injunction." Frankl ex rel. NLRB v. HTH Corp., 650 F.3d 1334, 1342 (9th Cir. 2011).

        "If the fine, or any portion of the fine, is coercive, it should be payable to the court. Moreover, in determining how large a coercive sanction should be the court should consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction." General Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1380 (9th Cir. 1986), citations omitted. "[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required." Int'l Union v. Bagwell, 512 U.S. 821, 827 (1994). "The party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by clear and convincing evidence, not merely a preponderance of the evidence." In re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993). While a full trial is normally held, where "the affidavits offered in support of a finding of contempt are uncontroverted, we have held that a district court's decision not to hold a full-blown evidentiary hearing does not violate due process." Peterson v. Highland Music, 140 F.3d 1313, 1324 (9th Cir. 1998).

### III. Discussion

The First TRO was issued April 27, 2012. Doc. 7.  The Second TRO was issued May 10, 2012. Doc. 19.  The Third TRO was issued May 30, 2012. Doc. 25.  The First PI was issued June 8, 2012. Doc. 30.  Each injunction superceded the prior one.

Bryant and Deliddo assert Matvishen has violated these orders:

> At no time until Plaintiffs commenced contempt proceedings did MATVIESHEN disclose to counsel or the court that there were share transfers of Sunlogics Plc disputed shares that MATVIESHEN allegedly commenced January 9, 2012 to transfer (a) Sunlogics Plc shares held by MATVIESHEN to Salamon Group, Inc.; (b) Sunlogics Plc shares held in 531682 BC Ltd1 to MATVIESHEN's wife, Shari Matvieshen, (c) Sunlogics Plc shares held by Epod and ICP to Salamon Group, Inc., and (d) Sunlogics Plc shares held by ICP to various member of the Husch family2 ('Attempted Share Transfers'). Plaintiffs believed that the MATVIESHEN admits that he took further action regarding these transfers after the TRO was in place by filing transfer tax documents (RJN Exh A) and paying excise taxes on the Attempted Share Transfers. Further, MATVIESHEN signed documents on behalf of Salamon Group, Inc. that were filed with the SEC, contemplating a shareholder meeting on unusually short notice, to approve 'prepayment' of MATVIESHEN for transfer of Sunlogics Plc shares to Salamon Group, Inc. By the amount of shares identified in the convertible debenture (Salamon SEC 10Q filing, RJN D), it would appear that the shares for which MATVIESHEN was going to accept "prepayment" included shares of Sunlogics Plc held by Millennium Trends International, Inc. as well as his personal shares, each of which were specifically not to be transferred pursuant to both the TRO and Preliminary Injunction Order. Moreover, MATVIESHEN sought to obtain through Salamon Group, Inc. super-voting rights as a part of the prepayment on these shares, which would have undermined the voting rights provided in the Preliminary Injunction Order. All of the foregoing actions were done notwithstanding the plain language of the TRO.

Doc 31, Part 1, 1:11-2:7.  The sanctions at issue are civil, not criminal.

With respect to this motion, the underlying conflict between the parties concerns certain sales of Sunlogics PLC stock.  Specifically, it involves a total of 14,278,342 shares transferred from Matvieshen, Epod, and ICP to Salamon, Matvieshen's wife Sheri Matvieshen, and members of the Husch family. Doc. 35, Part 1, Matvieshen Declaration, 2:13-23.  Of note, Matvieshen was to transfer 3,278,342 shares to Salamon, which was to receive a total of 11,703,342 shares (7,500,000 from Epod and 925,000 from ICP).[3]  Matvieshen claims that these transfers took

---

[3]There is some confusion as documents from Salamon describe receiving 13,500,000 shares from Matvieshen and associated partes (Doc. 31, Part 12, pages 4, 17, and 19 of 22) and receiving 13,248,342 shares (Doc. 31, Part 13, pages 15 and 19 of 32).  The court will assume that all of these figures are reconcilable and for simplicity, use 13.5 million shares as the number.

1  place of January 9, 2012.  Doc. 35, Part 1, Matvieshen Declaration, 2:9-10.  Bryant and Deliddo

2  claim that the transfers were never effected and argue that Matvieshen has taken actions since

3  April 27, 2012 to try to complete those transfers, violating violate the First and Second TROs.

4  Doc. 31, Part 1, 2:24-3:13.

5         To be clear, the First and Second TROs do not constitute a legal ruling on whether the

6  transfers in question were completed.  Their effect was to simply freeze the shares Matvieshen

7  had in his possession at the time.  If Matvieshen had attempted to sell the shares to another party

8  (pre-April 27, 2012) when they belonged to Bryant and Deliddo, then that other party will have to

9  institute legal proceedings against Matvieshen; that does not appear to be within the ambit of this

10 case.  As far as the court can determine, Matvieshen's post-April 27, 2012 acts thus do not create

11 facts on the ground that prejudice Bryant's and Deliddo's case with respect to ownership of

12 stock.

13

14 **A. British Documents filed on April 30, 2012**

15        Bryant and Deliddo assert Matvieshen filed documents in Britain that furthered the sale of

16 Sunlogics PLC stock in violation of the First TRO.  The tax forms are dated April 30, 2012. Doc.

17 31, Part 10.  Bryant and Deliddo filed their first motion for TRO in federal court on April 25,

18 2012. Doc. 6.  The First TRO went into effect on April 27, 2012. Doc. 7.

19        Matvieshen claims that he sent these tax documents to his lawyer in London before the

20 First TRO was issued: "Mr. Ronaldson therefore drafted documentation for paying the stamp

21 duty and forwarded them onto me for my signature on April 17, 2012.  I signed them without

22 dating them and returned them to Mr. Ronaldson before April 23, 2012....I caused to be wired to

23 Mr. Ronaldson the funds necessary to pay the stamp duty on April 4th which were settled on

24 April 5th.  It would be in violation of the obligation to pay the stamp duty to the government on

25 shares that had previously been transferred if these documents were not submitted to the stamp

26 office. Accordingly, Mr. Ronaldson dated his document that he had received from me when he

27

28

1   submitted the forms on April 30th and forwarded the same on to the stamping office for stamping

2   accompanied with a client account check to cover the cost of the stamp duty payable." Doc. 35,

3   Part 1, Matvieshen Declaration, 3:23-4:10.  Matvieshen has provided evidence that he sent Mr.

4   Ronaldson 10,875 British pounds on April 4-5, 2012. Doc. 35, Part 3.  The amount of tax paid

5   totaled 6,475 British pounds. Doc 31, Part 10.

6          First, there is no clear answer as to whether Matvieshen took any affirmative action after

7   the issuance of the First TRO.  Matvieshen's explanation is plausible and he has provided some

8   limited evidence in support.  The evidence is does not rise to the level supporting civil sanctions.

9          Second, to the extent that what Matvieshen did was pay British taxes, any violation of the

10  First TRO should be excused.  Bryant and Deliddo agree that documents filed on April 30, 2012

11  were "transfer tax documents...and paying excise taxes." Doc. 31, Part 1, Brief, 1:19.  A TRO

12  must not be casually interpreted to interfere with the compliance of any country's tax laws.  "It is

13  a general principle that one state cannot require a person 'to do an act in another state that is

14  prohibited by the law of that state or by the law of the state of which he is a national,' nor can the

15  person be required to refrain from an act that is required." Reebok Intern. Ltd. v. McLaughlin, 49

16  F.3d 1387, 1392 (9th Cir. 1995) (discussing effect of a US TRO in Luxembourg), citations

17  omitted.  The payment of taxes is generally not a matter of discretion.  There is some ambiguity

18  over whether the tax had to be paid as the parties dispute whether the transfer has actually taken

19  place.  Given these circumstances, the court does not find sanctions to be warranted.

20

21  **B. Salamon's May 18, 2012 Preliminary Proxy Statement**

22          In relevant part, the First TRO, issued April 27, 2012, stated that "Defendant Michael

23  Matvieshen, his agents, servants, employees, assignees, attorneys and all those acting in concert

24  or participation with him are RESTRAINED AND ENJOINED from taking any actions to sell,

25  transfer, hypothecate or encumber...the shares of common stock of Sunlogics PLC...at issue in

26  this case." Doc. 7, First TRO, 7:26-8:5.  "[O]n May 18, 2012 MATVIESHEN signed on behalf

27  of Salamon Group, Inc. and permitted to be filed with the SEC, a 14A Preliminary Proxy

28  Statement proposing and recommending to shareholders for a vote to 'prepay' Matvieshen for the

1   prohibited transfer of his Sunlogics Plc shares to Salamon Group, Inc. (RJN Exh C)....This was a

2   personal act of contempt because it was MATVIESHEN who signed the documents for Salamon

3   Group, Inc., as its CEO/Director, to request that the shareholders vote to 'prepay' him on a

4   convertible debenture for the stock purchase, further clouding title to the shares and personally

5   promoting representation that the transfer in January 2012 was valid and permitted." Doc. 31,

6   Part 1, Brief, 3:4-13.  In critical part, the plan to "prepay" Matvieshen was abandoned.  The First

7   PI subsequently clarified that "Specifically, Michael Matvieshen shall not attempt to further

8   process the alleged transfer of these Sunlogics Plc shares to Salamon Group, Inc." Doc. 30, 2:21-

9   23.

10        The action at issue is ambiguous.  First, Matvieshen's representation that the contested

11   Sunlogics PLC shares were transferred in January 2012 does not violate the First and Second

12   TROs.  As stated above, the injunctions in this case do not include a legal determination as to the

13   validity of the claimed sale.  What is significant is the plan to "prepay" Matvieshen.  The First

14   and Second TROs prohibits Matvieshen from "encumber[ing]" the contested shares.  Merriam-

15   Webster defines, in relevant part, "encumber" as "to burden with a legal claim (as a mortgage)."

16   See http://www.merriam-webster.com/dictionary/encumber.  Black's Law Dictionary defines

17   "encumbrance" as "Any right to, or interest in, land which may subsist in another to diminution

18   of its value, but consistent with the passing of the fee by conveyance." Black's Law Dictionary,

19   527 (6th ed. 1990).

20        According to Matvieshen and Salamon, "On January 9, 2012, the Company issued a

21   convertible note in the sum of $22,522,181 with a maturity date of January 9, 2013 to the

22   president of the Company in regards to the purchase of the shares of Sunlogics....The note bears

23   no interest and is to be paid in full on the maturity date, unless previously paid or converted into

24   the Company's common stock." Doc. 31, Part 13, Ex. D, Salamon Group, Inc. 10Q Filed May

25   23, 2013, 20 (21 of 32).  The plan to "prepay" the Sunlogics Group object to was to convert that

26   debt into new Salamon stock.  Salamon proposed "To prepay the convertible debenture issued to

27   Mr. Michael Matvieshen, the Company's CEO in consideration for 13,500,000 shares of

28   Sunlogics PLC, by issuing Mr. Matvieshen common shares or Series A Preferred Shares....On

January 9, 2012, the Company purchased 13,500,000 shares in Sunlogics PLC, from Mr. Michael Matvieshen, the Company's CEO, and others in consideration for $22,522,181 evidenced in the form of a secured convertible debenture ('Debenture'). The Debenture is secured by the PLC Shares and a General Security Agreement. The Debenture is convertible at any time from the date of issuance, pending an increase in the Company's authorized share capital, to the maturity date of January 9, 2013." Doc. 31, Part 12, Ex. C. Salamon Group, Inc 14A Preliminary Proxy Statement Filed May 18, 2012, 3 and 16 (4 and 17 of 22).  Thus, according to Matvieshen and Salamon, the sale of Sunlogics PLC stock has already occurred; Matvieshen had already been given a note for $22.5 million in payment for those shares.  Converting that $22.5 million note into Salamon stock would arguably not affect Bryant's and Deliddo's claims to the contested shares more than the existence of the convertible debenture note in the first place.  In contrast, Bryant and Deliddo characterize the transaction as "'prepayment' for the shares." Doc. 38, Reply, 4:19.  They do not discuss the implications of the convertible debenture.  Due to this dispute, it is not clear if this plan to "prepay" violated the First and Second TROs; the point is ambiguous.  As Matvieshen claimed to have already sold the contested stock, the proposal to convert the debenture can not be straightforwardly termed encumbering.  Regardless, Matvieshen and Salamon did not proceed with their plan.  As sanctions must be based upon clear violations of the injunctive language, they are not warranted at this point.

However, this issue must be clarified to avoid an ambiguity in the future.  Subsequent to the actions objected to, the First PI stated that "Specifically, Michael Matvieshen shall not attempt to further process the alleged transfer of these Sunlogics Plc shares to Salamon Group, Inc." Doc. 30, 2:21-23.  Matvieshen is now informed that attempting to receive payment for the convertible debenture (receiving money or stock) will be considered furthering the transfers of those shares and in violation of the injunction.  As it stands, Salamon owes Matvieshen approximately $22.5 million for those shares.  Matvieshen may not attempt to collect on that debt until further order by this court.  In January 2013, when the convertible debenture matures, he may roll it over or accept a straightforward IOU from Salamon.

**C. Number of Shares Specified in First PI**

The First PI orders Matvieshen to "deliver to his attorney, Rob Noblin, share certificates representing at least...8,505,119 shares of Sunlogics Plc issued to Matvieshen individually; and 20,000,000 shares in warrants for Salamon Group, Inc. stock." Doc. 30, First PI, 3:15-21. Matvieshen has only delivered 8,455,119 shares of Sunlogics PLC and 14,500,000 warrants in Salamon. Doc. 35, Opposition, 16:4-12. Matvieshen explains "I transferred to the possession of Rob Noblin, my counsel in this matter, 8,455,119 shares in Salamon Group. Those are all the shares I have ever held in Salamon Group post April 25, 2012, other shares held by me were canceled prior to the TRO. In earlier documentation, I went with the number of 8,555,119 Salamon shares because I was relying on my memory, which turned out to be faulty in this regard. But when I instructed Salamon Group to transfer to Mr. Noblin's possession all of my shares in the company, the number turned out to be 8,455,119, not 8,555,119. I originally had 20,000,000 warrants in Salamon Group, but on December 15, 2011, I assigned warrants to five people to induce them to provide services to Salamon....I have transferred to Rob Noblin the 14,500,000 Salamon warrants remaining in my name." Doc. 35, Part 1, Matvieshen Declaration, 4:19-5:9. At the May 10, 2012 hearing, the parties were ordered to confer on language for a preliminary injunction. At the May 29, 2012 hearing, the parties were again reminded to communicate with each other to determine the exact number of shares at issue. The point of directing the parties to confer was to have accurate share numbers so that the First PI would be clear and unambiguous. It appears that Matvieshen's failure to fully participate in that process has worked to hinder that goal.

Matvieshen has violated the plain language of the First PI. The cause of the violation can be traced back to his own behavior at an earlier stage of litigation. Sanctions are warranted. As Matvieshen has stated, he does not have sufficient Salamon stock or warrants to comply. Sanctions to coerce Matvieshen into complying with the First PI would not be appropriate. However, sanctions to compensate Bryant and Deliddo for excess effort expended in this case is appropriate. Attorney's fees for time spent conferring on proposed language for the First PI and making this motion for sanctions is awarded to Bryant and Deliddo. Cathleen Cowin represents

1   that June 5-14, 2012, she spent 19.2 hours working on the proposed preliminary injunction

2   language and making the motion for sanctions, which she billed at $250/hour. Doc. 31, Part 7,

3   4:26-5:6.  Matvieshen is ordered to pay Bryant and Deliddo $4,800.

4

5                                              **IV. Order**

6          Bryant's and Deliddo's motion for sanctions is GRANTED in part and DENIED in part.

7   Matvieshen violated the First Preliminary Injunction and is ordered to pay Bryant and Deliddo

8   $4,800 for excess effort due to that violation within thirty (30) days of the issuance of this order.

9          The First Preliminary Injunction is modified to cover 5,500,000 shares of Sunlogics PLC

10  stock held by Millennium; 2,481,073 shares of Sunlogics PLC stock held by Matvieshen;

11  8,455,119 shares of Salamon stock held by Matvieshen; and 14,500,000 shares of Salamon

12  warrants held by Matvieshen.

13         Within fourteen (14) days of the issuance of this order, Rob Noblin is ordered to file a

14  declaration stating whether he currently has in his possession share certificates representing at

15  least 5,000,000 shares of Sunlogics PLC stock held by Millennium; 2,481,073 shares of

16  Sunlogics PLC issued to Matvieshen individually; 8,455,119 shares of Salamon issued to

17  Matvieshen individually; and 14,500,000 shares in warrants for Salamon stock, in accord with

18  the First Preliminary Injunction (with the modifications explained by Matvieshen).  To ensure

19  clarity, Cathleen Cowin is also ordered to file within fourteen (14) days a declaration stating

20  whether she currently has in her possession share certificates representing 500,000 shares of

21  Sunlogics PLC held by Millennium, in accord with the First Preliminary Injunction.  As is clear

22  by the language of the First Preliminary Injunction, Rob Noblin and Cathleen Cowin are

23  personally bound by its terms.

24  IT IS SO ORDERED.

25  Dated:    November 15, 2012

26                                              _____
                                                UNITED STATES DISTRICT JUDGE

27

28

18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28